# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIM. NO. 06-60021-06** |
| **VERSUS** | * | **JUDGE MELANCON** |
| **CHAD ZENO** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

The defendant, Chad Zeno ("Zeno"), filed a Motion to Suppress items seized during several searches and seizures made on four separate occasions. (rec. doc. 64). The government has opposed the motion. (rec. doc. 78). The motion was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) for Report and Recommendation. The undersigned conducted an evidentiary hearing on the defendant's motion. (rec. doc. 93). The parties were given leave to file post-hearing memoranda, which each did. (rec. doc. 99 and 100). For those reasons set out below, it is the recommendation of the undersigned that the motion be **GRANTED in part and DENIED in part.**

## PROCEDURAL SETTING

The defendant was indicted for violation of Title 18 United States Code §§ 841(a)(1)(a) and 846 with seven co-defendants. The charges against this defendant primarily arise from several searches which occurred on four separate occasions on four different dates. The facts surrounding each search are different. The defendant filed a motion to suppress the items seized on each of these four occasions. For clarity, the search or

searches conducted on each date will be treated separately.

## THE SEARCHES

### A. Search on November 20, 2003

### 1. Facts

On November 20, 2003, local police searched the premises of 1121 South Magnolia Street in Lafayette. That premises was a building which had formerly been owned by the defendant which he had operated as a restaurant. The defendant had, at some time in the past, sold the building to Tellis Vallier. (Tr. 43). At the time of the search, Vallier was trying to sell the building and had listed it with a realtor for sale. A "For Sale" sign was in place in front of the building. (Tr. 52).

After developing what he believed to be probable cause sufficient to search the building, Detective John Kelly ("Kelly"), Lafayette Parish Sheriff's Office, decided to apply for a state search warrant to search the building. In that regard, Kelly went back to his office to type a search warrant application and warrant for presentation to state District Judge Ed Rubin of the Fifteenth Judicial Court. Apparently, the computer software which Kelly had used in the past to prepare search warrants and search warrant applications had been changed. Kelly called his supervisor and reported that he, Kelly, had found the search warrant application template, but that he was unable to find the template for the warrant. (Tr. 19). Kelly was told by his supervisor to bring what he had (the search warrant application) to Judge Rubin and to thereafter show the owner of the

property what had been signed and "go from there". (Tr. 19). No actual search warrant was ever presented to Judge Rubin, so, of course, no search warrant was ever signed. (Tr. 29). The affidavit, which is clearly entitled "APPLICATION FOR AND AFFIDAVIT(S) IN SUPPORT OF ISSUANCE OF SEARCH WARRANT", was signed and sworn by Kelly before Judge Rubin, who signed the application as the person administering the oath to the affiant, Kelly. (Government Exhibit 1). Kelly testified that he knew that when requesting a search warrant, certain documents are necessary, but that he had done as ordered by his supervisor. (Tr. 30). In short, the record is absolutely clear: **no search warrant was ever presented to Judge Rubin and no search warrant was ever signed**.

Kelley took the signed application to the premises, presented the application as a search warrant and conducted a full search of the premises. Various items of evidence were seized. Kelly then returned to Judge Rubin's chambers and made his return on the warrant. Kelly did not see Judge Rubin at that time; he left the search warrant return with Judge Rubin's secretary. (Tr. 39). Kelly said that he had applied for and executed more than forty search warrants in his career and that he was aware of how the process worked; on each of those more than forty occasions, a judge signed an order authorizing the search. (Tr. 35).[1]

---

[1]This issue was tried in state court to Judge Durwood Conque on a motion to suppress evidence on state charges which had been filed against the defendant. A copy of the transcript of that hearing was filed as an exhibit in this hearing. In that hearing, Judge Conque held the evidence obtained as a result of the search was admissible at trial. However, Judge Conque was led to believe that a search warrant had, in fact, been issued. No warrant was ever produced in that hearing. Clearly, Judge Conque was misled.

## 2. Law and analysis

### a. The search

At the time of the hearing, the undersigned noted that it was apparent that no warrant was ever obtained in this case and that it appeared that the search was made without a warrant. The government was allowed time to attempt to find jurisprudential authority to support the position that the affidavit signed by Kelly and served by him as a warrant was, in law, a search warrant. The government cited no such authority in its post-hearing memorandum. Rather, the government argued that the good faith exception to the exclusionary rule exists under these facts and, further, that Zeno does not have standing to contest the search. (rec. doc. 100, p. 2).

The government apparently concedes, as it must, that no search warrant was issued.

Similarly, the government does not argue that the affidavit signed by Kelly can serve as a warrant. Rather, the government relies on *United States v. Kelley*, 140 F.3d 596, 602 (5th Cir. 1998), for the proposition that the evidence obtained from the premises of the search is admissible under the good faith exception to the exclusionary rule which was articulated in *United States v. Leon*, 468 U.S. 897, 922-23, 104 S.Ct.3405, 3420-21 (1984).

In *Kelley*, an IRS agent submitted a search warrant application and an unsigned warrant to the Magistrate Judge for his consideration. The Magistrate Judge asked several

questions, commented on the facts contained in the application, and determined that probable cause existed for the search. Thereafter, the Magistrate Judge signed the search warrant application, using an incorrect date and forgot to sign and date the warrant which he returned to the agent. The Magistrate Judge answered affirmatively when he was asked by the agent if all necessary steps for securing the warrant had been taken. *Kelley,* 140 F.3d at 602 n. 4. Based on these facts, the Fifth Circuit applied *Leon*, holding that the agent was in good faith in relying on that which he had been told by the Magistrate Judge. The court held that the warrant which had been returned to the agent was technically insufficient, in that it lacked a signature and a date. *Id*. at n. 5. Accordingly, the application of the exclusionary rule was inappropriate.

Implicit in the court's holding in *Kelly* is that a warrant, in fact, existed. That is not the case here. No warrant was ever prepared; no warrant was ever presented to Judge Rubin for his consideration. Accordingly, no warrant was ever issued; unlike Kelly, this is not a case of a failure of the Judge to perform a mere ministerial duty, that is, the signing of a warrant after probable cause has been determined. Here, no warrant ever existed.

Furthermore, the court in *Leon* made it clear that for the good faith exception to apply, an officer's reliance on the technical sufficiency of the warrant not only must be made in good faith, but also must be **objectively** reasonable; the Court recognized that in some circumstances an officer will **not** have objectively reasonable grounds for believing that a warrant is valid.(emphasis added) *Id.* at 3420-21. In this case, no warrant ever

existed. Kelly cannot have had a good faith belief in the validity of a warrant which never existed and which he knew had never been prepared.

Additionally, Kelly cannot be said to have had "objectively reasonable" good faith. Kelly quite candidly admitted that he had been involved in executing over forty search warrants and that he was fully aware that in each case a judge signed an order authorizing the search. Indeed, Kelly knew that he had no such order in this case and specifically asked his supervisor about the location of the template for the order authorizing the search (the warrant). His supervisor told Kelly to "go with what he had," and that is what Kelly did. No search warrant was ever prepared, much less presented to Judge Rubin for his consideration. Kelly objectively knew that a warrant was required and that he did not have one. Under the circumstances of this case, *Leon* does not apply.

The Fourth Amendment prohibits unreasonable searches and seizures. Warrantless searches are *per se* unreasonable, and are subject to only a few well-delineated exceptions. The burden is on the government to show the existence of one of these exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514 (1967); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S. Ct. 1969, 1972 (1970); *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032 (1971) and *United States v. Jones,* 234 F.3d 234, 239 (5th Cir. 2000). Here, the government concedes that no exception to the search warrant requirement exists. Accordingly, since the search of the building located at 1121 South Magnolia Street in Lafayette was conducted without a warrant and since no

exception to the warrant requirement exists, the search was unreasonable in Fourth Amendment terms.

### b. Standing

The government argues that the defendant has no standing to contest the search because he did not have a reasonable expectation of privacy in "a vacant building that he did not own or rent." (rec. doc. 100, p. 2). The government's argument on this issue consists of one paragraph with no supporting legal authority.

The defendant argues that, under the principles of *Alderman v. United States*, 349 U.S. 165, 179, 89 S.Ct. 961,969 (1969) and *Rawlings v. Kentucky*, 448 U.S. 98, 104,100 S.Ct. 2556, 2561 (1980), that he had a reasonable expectation of privacy, that is, an expectation of privacy that has a source outside the Fourth Amendment, either by reference to concepts of real or personal property law, or to understandings that are recognized and permitted by society. (rec. doc. 99, p. 4). The defendant further cites *Dow Chemical Company v. United States*, 476 U.S. 227, 235, 106 S.Ct. 1819, 1825 (1986) and *Marshall v. Barlow's*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1819 (1978), for the proposition that the warrant clause of the Fourth Amendment protects commercial buildings as well as private homes.

To determine if Zeno has standing to contest the search, the question becomes whether or not Zeno had a reasonable expectation of privacy in the building searched. Stated another way, did Zeno have an expectation of privacy outside the Fourth

Amendment, one that is granted by reference to concepts of real or personal property law or understandings that are recognized and permitted by society? *Alderman, supra.*

The Fifth Circuit has characterized the issue thusly: Whether there is standing to contest the validity of a search "depends on (1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and (2) whether that expectation of privacy is one which society would recognize as reasonable." *U.S. v. Gomez*, 276 F.3d 694, 697 (5th Cir. 2001). The defendant has the burden of proving such an expectation by a preponderance of the evidence. *United States v. Vega*, 221 F.3d 789, 795 (5th Cir. 2000).

The courts have recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes. An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider as reasonable. *New York v. Burger*, 482 U.S. 691,699, 107 S.Ct. 2636, 2642 (1987).

A lessee of a residence has a legitimate expectation of privacy in the residence. *Vega*, 221 F.3d at 795. Since Fourth Amendment protection extends to businesses as well as homes, *Burger*, it follows that a lessee of a business has a legitimate expectation of privacy in the business premises. Indeed, in *United States v. Cardoza-Hinojosa*, 140 F.3d 610, 613 (5th Cir. 1998), the court noted that it was "settled law" that the Fourth Amendment's protections against arbitrary searches and seizures are presumptively

applicable not only in an individual's home, but also in any commercial premises he may own or use.

It is clear, however, that a property interest alone, in the premises searched is not sufficient to confer standing. Rather, the Fifth Circuit has identified a "nuclei" of factors to be considered in determining whether a reasonable expectation of privacy exists. These factors are: whether the defendant has a property or possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises. *Cardoza-Hinojosa,* 140 F.3d at 615, *citing United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991).

Applying these factors to the facts of this case, I find that Zeno had a reasonable expectation of privacy in the building located at 1121 South Magnolia Street in Lafayette, and thus has standing to contest the search.

Previously, the building that was searched was owned by Zeno; he had operated a restaurant there. (Tr. 43-44). At the time of the search, Zeno testified that he had agreed with the owner of the building, Tellis Vallier, to rent the building for $700 per month and re-open his restaurant. There was no written lease agreement between Zeno and Vallier. At the time of the search, the restaurant was not open for business, and no rent had yet been paid. (Tr. 47). The building interior was in need of repair before the restaurant could

re-open. It was agreed that Zeno would do the repairs and the clean-up which was necessary, at his own expense, and that the rental would not be due until after the restaurant re-opened when the repairs were completed. Zeno further testified that if the restaurant was successful, he had an option to buy the building back from Vallier. (Tr. 50). At the time of the search, the building had a "For Sale" sign posted. Apparently Vallier had the building on the market for sometime and had been unsuccessful in selling it. (Tr. 50). Vallier had given Zeno the keys to the building. (Tr. 47).

Zeno's testimony was partially corroborated by Kelly's investigation. Kelly testified that he talked to Vallier, the owner of the building, who told Kelly that he, Vallier, was in the process of selling the building back to Zeno although they had no written agreement. (Tr. 53). Kelly confirmed that a "For Sale" sign was posted in front of the building. Vallier did not say anything to Kelly about a lease or lease-purchase; Kelly did not ask. Vallier told Kelly that he, Vallier, did not have a key to the building and that he had given the keys to Zeno. The building was locked with deadbolt locks when the officers entered. (Tr. 59). At the time of the search, Zeno had the key to the building locks in his pants pocket. Zeno was the only person in the building at the time of the search. (Tr. 64). When the officers entered, there was trash everywhere and the building needed cleaning. (Tr. 56 and 58). There were paint and rollers in the building and some painting had been done. (Tr. 61).

Based on the above, and particularly that portion of Zeno's testimony that was corroborated by Kelly's investigation, I find that the defendant, Zeno, has standing to contest the constitutionality of the search at 1121 South Magnolia Street in Lafayette. Clearly, Zeno had a possessory interest in the building, either as a lessee or prospective purchaser. Vallier had given all of his keys to Zeno. Zeno was legally in the building, alone, at the time of the search and had the right and ability (by virtue of his possessory interest and his having the keys in his possession) to exclude others from the premises. Furthermore, Zeno exercised his dominion and control over the building by locking the doors with deadbolt locks.

While Zeno's status as lessee is not conceded by the government, it is undisputed that the building's owner had turned the building over to Zeno, and that Zeno was doing repairs and painting in the building. This further corroborates part of Zenos' story. In applying the "nuclei" of factors set out by the Fifth Circuit in *Ibarra* to the facts here, it is clear that Zeno has standing. Zeno had (at least) a possessory interest in the building, had a right to exclude others from the building (as shown by the locked door and possession of the keys), exhibited a subjective expectation of privacy (by locking the doors), and took normal precautions to maintain privacy (again by locking the doors). In short, each of the "nuclei" set forth in *Ibarra* is present here. Zeno has standing to contest this search.

Since Zeno has standing to contest the constitutional validity of the search, since the search was conducted without a warrant and since none of the exceptions to the

warrant requirement exist (none are even argued by the government), the motion to suppress the items seized in the search of the premises located at 1121 South Magnolia Street, Lafayette, Louisiana on November 20, 2003 should be **granted**.

### B. Search on August 18, 2005

### 1. Facts

Lafayette City Police Officer Glenn Landry ("Landry") was patrolling in his marked police unit on Cora Street approaching its intersection with Paul Breaux Street. At that time, he saw a vehicle approach the intersection, come to a complete stop, and then begin to back up at what Landry considered high speed. (Tr. 68). That neighborhood has children and pedestrians which often walk on the street, and had cars parked on the street which restricted vision for drivers and pedestrians. Landry turned onto Paul Breaux Street, in front of the backing car, and turned on his overhead lights. The vehicle then backed into a driveway on Paul Breaux; Landry followed. (Tr. 69). Landry told the driver of the vehicle (Zeno) to exit the vehicle, which he did. Landry asked Zeno for his driver's license and proof of insurance. Landry was extremely nervous and was visibly shaking. (Tr. 71). When Landry approached Zeno's car, he "observed" a strong smell of marijuana coming from the car. (Tr. 70). Landry decided to detain Zeno for further questioning and started to handcuff Zeno. A that point, Zeno began to run. After a short pursuit, Zeno was caught and handcuffed. (Tr. 71).

A drug detection dog was summoned and alerted on the car. The car was thereafter searched, and various items were seized therefrom. (Tr. 72-73). A search of Zeno's person, conducted prior to the arrival of the dog but after he was handcuffed, resulted in the seizure of a small amount of marijuana from his back pocket. (Tr. 71). Landry testified that when he first attempted to handcuff Zeno, that he did so for "officer safety" and that he did not intend to arrest Zeno at that time. (Tr. 73).

**2. Law and analysis**

The defendant agues that the initial stop of the defendant was illegal and that therefore the subsequent searches were illegal, also. Specifically, the defendant argues that Zeno committed no traffic offense and that since Landry had no reasonable articulable suspicion that Zeno had, or was about to, commit an offence, the stop was illegal under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968). The defendant further argues that since Landry had no right to arrest Zeno and that since the handcuffing of Zeno constituted an arrest, that Zeno was free to run because in Louisiana a person has a legal right to resist an unlawful arrest. (rec. doc. 99, p. 6-8).

Landry was legally justified in stopping the defendant. L.R.S. 32:281 provides, in pertinent part, that the driver of a vehicle shall not "back same" unless such movement can be made in reasonable safety. Given the neighborhood in which the incident occurred and the speed of the vehicle, Landry was justified in stopping the defendant to investigate his driving. The fact that Landry testified that he did not recall seeing any pedestrians

present does not change the fact that Landry was justified in stopping the car to investigate. Landry was also fully justified in asking Zeno for his license and proof of insurance. This led to Landry's "smell" of the marijuana.

The legality of a traffic stop is analyzed under the framework articulated in *Terry*. Under the two-part *Terry* reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 19-20; *United States* v. *Brigham,* 382 F.3d 500, 506 (5th Cir. 2004), *en banc* and *U.S. v. Lopez-Moreno,* 420 F.3d 420, 429-434 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. *See United States v. Breeland,* 53 F.3d 100, 102 (5th Cir.1995). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002); *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695 (1981). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the stop. *See, e.g., United States v. Santiago,* 310 F.3d 336, 340 (5th Cir.2002). In evaluating the totality of the circumstances, a court may not

consider the relevant factors in isolation from each other. *Arvizu,* 534 U.S. at 274, 122 S.Ct at 751. However, it is clear that the officer's mere hunch will not suffice. *Terry,* 392 U.S. at 27. It is also clear that reasonable suspicion need not rise to the level of probable cause. *Arvizu,* 534 U.S. at 274, 88 S.Ct. at 1883.

In applying these principles to the facts of this case, it is clear that Landry's initial stop of Zeno was permissible. Landry had cause to believe that Zeno had violated L.R.S. 32:281 because of the speed of his backing in a residential neighborhood with restricted driver and pedestrian vision. Since Landry stopped Zeno for a potential traffic violation, the stop was justified at it inception. Once a police officer stops a person for a traffic violation, he is entitled to ask the driver for his license and proof of insurance. *United States v. Brigham,* 382 F.3d at 506-507. That is precisely what Landry did here. It was at that time that Landry smelled the marijuana.

It was at this point that Landry attempted to handcuff Zeno for, in Landry's words, "officer protection" while his investigation continued. At that point, Landry had reasonable suspicion, but did not have probable cause to arrest. Indeed, Landry testified he did not intend to arrest Zeno at that time. Landry's intentions aside, there is no real question but that placing handcuffs on Zeno would have been an arrest.

La.Code Crim. Proc. art. 201 defines "arrest" as:

> Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him.

In *State v. Thibodeaux,* 414 So.2d 366, 368 (La.1982), the Louisiana Supreme Court stated: "[w]hether a person has been taken into custody, detained or deprived of his freedom in a significant way must be decided by an objective test. Neither the defendant's subjective impression nor the formality of an official arrest will be determinative of the issue of his claimed illegal detention." Rather, the proper inquiry is whether the person, in view of the circumstances, is prevented from exercising his liberty for more than a transitory moment. (citations omitted). *Id.* Once there is an extended restraint on one's liberty, that person is under arrest. *State v. Freeman,* 503 So.2d 753, 757 (La.App. 3 Cir. 1987), *see also United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980).

The defendant argues that since Landry sought to make an illegal arrest (the handcuffing of Zeno), that Zeno was entitled to resist that arrest. The defendant cites *City of Monroe v. Ducas*, 14 So.2d 781, 784 (La. 1943) in support of that argument. While a correct statement of Louisiana law, the defendant's argument misses the point here. While the defendant has the right to run from the police if he is resisting an unlawful arrest, and while it is true that merely running from the police does not violate the law, *State v. Grogan*, 373 So.2d 1300 (La. 1979), flight from the police may be used by the police as one of the factors to establish probable cause to arrest. *State v. Flanagan*, 691 So.2d 866, 869 (La. App. 2 Cir. 1997).

If additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. *See Brigham,* 382 F.3d at 507; *United States v. Grant,* 349 F.3d 192, 196 (5th Cir. 2003). Accordingly, when Zeno ran from Landry, even though Zeno's running was a legal act, Landry was entitled to consider that fact in determining probable cause to arrest. Clearly acts legal on their face, as well as illegal acts, may lead to probable cause to arrest. Therefore, when Zeno was caught and handcuffed, the police had probable cause (the strong smell of marijuana, Zeno's extreme nervousness and Zeno's attempted flight) to arrest Zeno. Since the police had probable cause to arrest Zeno, they were entitled to search his person. *United States v. Charles*, ___ F.3d ___, 2006 WL 3114481, *2 (5th Cir. 2006).

Zeno's flight, arrest and the smell of marijuana in the car was sufficient to cause additional reasonable suspicion to further prolong the stop until the drug dog could be summoned to "check" the car. Once the dog alerted on the car, there was sufficient probable cause to search the car at that time.[2]

As stated above, the Fourth Amendment prohibits unreasonable searches and seizures. Warrantless searches are *per se* unreasonable, and are subject to only a few well delineated exceptions. The burden is on the government to show the existence of one of

---

[2]Indeed, it has been held that the smell of marijuana alone is sufficient probable cause to search a vehicle *United States v. McSween,* 53 F.3d 684, 686-687 (5th Cir.1995) (the smell of marijuana alone may be enough for a finding or probable cause), and cases cited therein.

these exceptions. *Katz,* 389 U.S. at 357, 88 S. Ct. at 514 (1967); *Vale,* 399 U.S. at 34, 90 S.Ct. at 1972 (1970); *Coolidge,* 403 U.S. at 455, 91 S.Ct. at 2032 (1971) and *United States v. Jones,* 234 F.3d at 239. To justify the search of the car, the government relies on the so-called automobile exception to the warrant requirement. *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 2487 (1996); *see also U.S. v. Williams*, 124 Fed.Appx. 885, 887 (5th Cir. 2005) and *U.S. v. Scott*, 108 Fed.Appx. 168, 169 (5th Cir. 2004).

Since the police searched the Zeno vehicle with probable cause, the search was constitutionally permissible even though no search warrant was obtained. *Labron*, *Williams* and *Scott*. Accordingly, for these reasons, the defendant's motion to suppress the evidence obtained from the search of the defendant's person and the vehicle he was driving on August 18, 2005, should be **denied**.

### C. Search on October 14, 2004

### 1. Facts

On October 14, 2004, Officer Brion Gilbert, Lafayette City Police, was on patrol in downtown Lafayette, near Taft Street and Convent Street, when he observed a vehicle traveling without headlights. It was after 10:00 p.m. and fully dark. (Tr. 80 and 84). Officer Gilbert effected a traffic stop for the violation. Gilbert identified the driver as the defendant, Zeno. Gilbert, who had previously worked in the narcotics unit, recognized a strong smell of marijuana on the person of the defendant and also coming from the car. (Tr. 81). Gilbert patted the defendant down for weapons, and called for a narcotics dog.

Gilbert advised Zeno of his *Miranda* rights. Zeno denied possessing any drugs, but did admit to having smoked marijuana earlier that day. (Tr. 83). After the dog arrived, it "alerted" on the vehicle and the vehicle was searched. Various items were seized from the car. (Tr. 82).

### 2. Law and analysis

Without again reciting the legal principles and authorities discussed above, it is clear that the initial stop by Gilbert was permissible under *Terry*, that reasonable suspicion arose during the course of the stop (and before the initial purpose of the stop ended) sufficient to justify the continued detention of the defendant to permit the search of the car. *See Brigham,* 382 F.3d at 507 and *Grant,* 349 F.3d at 196. Given the strong smell of marijuana coming from both the vehicle and from the defendant's person, the defendant's admission that he had smoked marijuana earlier that day and the "alert" by the narcotics dog on the car, probable cause to search the car clearly existed. The search of the vehicle with probable cause and without a warrant was permissible pursuant to *Labron*.

Accordingly, the motion to suppress the items seized from the defendant's vehicle on October 14, 2004 should be **denied**.

**D. Search on May 17, 2000**

**1. Facts**

On May 17, 2000, then Sergeant McCullan Gallien ("Gallien") was working in the Lafayette Metro Narcotics Task Force ("Task Force"). (Tr. 86). On May 16, 2000, a confidential informant ("CI") working for the Task Force made a purchase of crack cocaine from a residence located at 318 Sunnyside Street in Lafayette. Following that buy, and perhaps one other buy from the same address the next day, Agent Chad Landreneau ("Landreneau") of the Task Force applied for, and obtained,  a state search warrant for that residence. Gallien was present when the warrant was executed on May 17. (Tr. 88). The application and warrant were introduced at the hearing as Government Exhibit 2. (Tr. 91). When the warrant was executed, a number of people outside the house were detained, one of whom was Zeno. (Tr. 94). There was no arrest warrant for Zeno, and Gallien had no reason to believe Zeno had committed a crime. (Tr. 95). Zeno did not live at 318 Sunnyside, the location where the warrant was executed. (Tr. 96). Zeno testified that his grandfather lived at 318 Sunnyside. On the day of the search, Zeno testified that he drove his car into the driveway at his grandfather's house, left the engine running, got out of the car and went up onto the porch to visit his grandfather. Zeno testified that he was there for about five minutes when the police arrived to execute the warrant. (Tr. 100).

Zeno testified that the police pulled him off of the porch and put him face down on the ground. Zeno said that he was held there for about thirty minutes to an hour. The officers then got Zeno off of the ground and handcuffed him. The officers then went over to the car, which was still running, and began to look inside. Thereafter, Zeno testified that he gave the officers permission to search the car. (Tr. 100-101). Zeno estimated that he gave the permission to search to the officer about an hour and a half to two hours after the search of the house began. (Tr. 102).[3] Zeno testified that he gave his consent to search the car voluntarily. (Tr. 105).

**2. Law and analysis**

The search warrant for the house was issued by Commissioner Diana Simon of the Fifteenth Judicial District Court. The warrant authorized the search of "the place 318 Sunnyside Street, Lafayette ...." (Government Exhibit 2). The defendant argues that the search warrant does not authorize the search of the defendant's car, which was found on the premises at the time the search warrant was executed. The defendant further argues that the officers improperly detained the defendant, and that this detention was the result of the unlawful detention rather than an act of the defendant's free will. The defendant urges the court to consider not only the defendant's consent, but also the temporal proximity between the detention and the consent, citing *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62 (1975). (rec. doc. 99, p.13). The government relies on the

---

[3]Gallien said he did not remember how long Zeno was detained before his vehicle was searched. (Tr. 97).

defendant's consent to search his vehicle as justifying the search. Neither in the original opposition to the defendant's motion to suppress nor in the post-hearing memorandum does the government argue that the search warrant for the house located at 318 Sunnyside authorized the search of the car. (rec. doc. 78 and 100).

Furthermore, the government fails to address the delay between the initial detention of the defendant and the time when the consent to search the car was given. Clearly the police had the right to detain Zeno, at the scene, initially for their protection and later for investigative purposes. Such a seizure of Zeno's person is authorized by *Terry*. However, as was discussed above, the duration of the detention must not only be justified at its inception; it must also be reasonably related in scope to the circumstances which justified the detention in the first place. There is nothing in this record which would allow the undersigned to find that the detention of Zeno for up to two hours was reasonably related to the circumstances which originally justified the detention. Quite simply, no evidence was adduced at the hearing which would justify the police detaining Zeno for up to two hours before he gave the consent to search.[4]

The Fifth Circuit has had occasion to analyze many traffic stops which resulted in otherwise valid consents to search under *Terry*. The holdings in *United States v. Dortch,* 199 F. 3d 193 (5th Cir. 1999) and *United States v. Jones*, *supra*., would seem to require

---

[4]Gallien testified that he thought Zeno was free to leave after having been patted down, but the fact is that Zeno was apparently never told he could leave, was put face down on the ground and at some point was handcuffed. These facts are not consistent with Gallien's belief that Zeno was free to go.

that the court grant the defendant's motion to suppress the items found in the search of the car because of the delay between the time of the initial detention (albeit not a traffic stop) and the time that the consent to search was given. However, the analysis in this case does not end there.

Although the government does not argue that the search of the car was justified by the search warrant for the house, that appears to be the case. The search warrant authorized the search of "the place located at 318 Sunnyside Street, Lafayette, Louisiana." It is uncontradicted that Zeno's car was in the driveway at that "place" when the police arrived to execute the warrant. The defendant argues that the search of the car pursuant to the warrant would violate the "particularity requirement" of the Fourth Amendment. In support of that argument, the defendant relies on *Ybarra*. In *Ybarra*, the Supreme Court held that a search warrant for a particular premises does not authorize the search of persons found at the premises. The defendant argues that the same rule should apply to cars found on the premises, but not identified in the warrant.

The defendant's argument is not without appeal. Unfortunately for him, it has been rejected by the Fifth Circuit. In *U.S. v. Singer*, 970 F.2d 1414, 1418 (5th Cir.1992), the court noted that "[t]his court has consistently held that a warrant authorizing a search of 'the premises' includes vehicles parked on the premises." *Singer* relied on a long line of cases in the Fifth Circuit including *United States v. Cole,* 628 F.2d 897, 899 (5th Cir.1980), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981); *United*

*States v. Freeman,* 685 F.2d 942, 955 (5th Cir.1982) ( "the warrant for a search 'on the premises known as 256 Seadrift Road' was sufficiently particular to permit a search of [a jeep] parked on the premises off the street and close to the house.") and *United States v. Napoli,* 530 F.2d 1198, 1200 (5th Cir.) *cert. denied,* 429 U.S. 920, 97 S.Ct. 316, (1976) ("the reference to 'on the premises known as 3027 Napoleon Avenue' was sufficient to embrace the vehicle parked in the driveway on those premises.").

Any argument that the defendant might make that Zeno's car was not be covered by the warrant because the car was not on the premises *at the time the warrant was issued* (as opposed to when the warrant was *executed*) is foreclosed by *United States v. Alva*, 885 F.2d 250, 251 (5th Cir 1989). In *Alva* the court, relying in part on *Napoli* and *Freeman,* held that a warrant to search "any and all vehicles found on the premises of 223 Burcham" included a vehicle which arrived at that address after the search began. *Id.*

Clearly, if a warrant for the search of premises includes the search of vehicles that arrive during the search, a vehicle which is on the premises at the time the search begins (even if not there when the warrant was issued) is authorized by the warrant.

The only difference between the warrant in this case and the warrants at issue in *Singer*, *Cole, Freeman* and *Napoli* is that the warrant here was for the "place" rather than for the "premises". The undersigned attaches no constitutional significance to the different verbiage, particularly given that "[i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place

intended." *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 416 (1925). With that constitutional principle in mind, the undersigned finds no constitutionally significant difference in the use of the terms "premises" (in *Singer*, *Cole* , *Freeman* and *Napoli*) and "place" (here) for purposes of the particularity requirement.

In short, the search of the vehicle driven by Zeno was authorized by the warrant because it was located at the "place located at 318 Sunnyside Street, Lafayette, Louisiana." Since the search of the car was authorized by the warrant, the seizure of the items from the car was valid, and the motion to suppress those items should be **denied**.

## CONCLUSION

For the reasons set out above, it is recommended that the motion to suppress filed by the defendant Chad Zeno should be **granted in part and denied in part** as set out above.

Under the provisions of 28 U.S.C. §636 (b) (1) (C) and Rule 72 (b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by**

**Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Lafayette, Louisiana, December 20, 2006.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE